COURTENAY D. ALLINGTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LESLIE E. ALLINGTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53411, 53412.   Promulgated October 25, 1934.

*Laurence A. Masselink, Esq.*, for the petitioners.
*Owen W. Swecker, Esq.*, for the respondent.

OPINION.

MURDOCK: The Commissioner early established the rule that " when shares of stock in a corporation are sold from lots purchased at different dates and at different prices and the identity of the lots can not be determined, the stock sold shall be charged against the earliest purchases of such stock." Art. 58, Regulations 74; *Towne* v. *McElligott*, 274 Fed. 960. Section 115(c) of the Revenue Act of 1928 provides that amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock and the gain shall be determined under section 111. The petitioners do not attack the rule nor claim that it does not apply to stock canceled in liquidation of a corporation. They contend that their shares canceled can be identified and the first in, first out rule does not apply. The Commissioner has held that the identity of the shares canceled can not be determined and his determination must be approved unless the petitioners have produced evidence showing the identity of the shares canceled.

Courtenay D. Allington relies principally upon his testimony that he knew of the Commissioner's first in, first out rule and intended to have canceled his lot of 47 shares in its entirety and 10.33 shares from his lot of 100 shares in order to realize a minimum gain for tax purposes. He argues that the certificate for 47 shares would not have been turned in by him if he had not intended to have those shares canceled. But the method used by him in reporting his gain on his income tax return made shortly afterward does not indicate that such was his intention. On the contrary, it indicates that he had no such intention. Furthermore, the petitioner filed an original petition and two amended petitions, and only in the amended petition filed on the day of the hearing does he suggest and pray for a recomputation based upon the cost of the 47 shares and the 10.33 shares. There may have been a different reason for turning in all outstanding certificates. The name of the corporation was changed on October 5, 1928, and the corporation may have desired to issue new certificates bearing the new name. This point was not called to the attention of the witness and it may be that there was no such change made. Still, for some reason, all certificates were turned in, 39 percent of the stock was canceled, and new certificates were issued. If the witness intended that all of his 47-share lot should be canceled and only 10.33 shares of his 100-share lot, he never did anything to see that his wishes were carried out. A mere intention to sell certain shares is not sufficient to identify the shares actually sold. *Skinner* v. *Eaton*, 34 Fed. (2d) 575; affd., 45 Fed. (2d) 568; certiorari denied, 283 U. S. 837; *A. D. Geoghegan*, 31 B. T. A. 93; *Mary E. Horner*, 28 B. T. A.

360; affd., 72 Fed. (2d) 407; *Mickler Holding Co.*, 29 B. T. A. 300; *Commissioner* v. *Merchants & Manufacturers Fire Insurance Co.*, 72 Fed. (2d) 408; *Snyder* v. *Commissioner* 73 Fed. (2d) 5, affirming 29 B. T. A. 39. The petitioner simply turned in both certificates and the impossibility of determining which particular shares were canceled and which were reissued in the new certificate is obvious. The shares went into hotchpotch and all identity was lost. The application of the Commissioner's rule under such circumstances seems entirely warranted. The rule is fair and reasonable. *Snyder* v. *Commissioner*, 54 Fed. (2d) 57, affirming 20 B. T. A. 778; *Skinner* v. *Eaton, supra; Burdett Stryker*, 21 B. T. A. 561; *Towne* v. *McElligott, supra; Commissioner* v. *Merchants & Manufacturers Fire Insurance Co., supra.* It has been used for many years. The petitioner's remaining shares carry the remaining cost. The Commissioner might have adopted a rule of averaging the cost of all shares, but he did not, and, since the rule he adopted is a reasonable one, we can not reject it and apply another in its place. *Skinner* v. *Eaton, supra.* Cf. *David Stewart*, 17 B. T. A. 604.

The record is not as complete in regard to Leslie E. Allington as it is in the case of Courtenay D. Allington. However, counsel do not seem to be in dispute in regard to the facts and seem to agree that there are no material differences in the facts in the two cases.

Reviewed by the Board.

*Decisions will be entered for the respondent.*

---

ADAMS, dissenting: This appeal presents only one question for determination: Were the shares of stock surrendered by petitioners susceptible of identification, and, if so, was the testimony sufficient to identify them so as to take them out of the first in, first out rule?

I think it valuable in the consideration of this question to further examine the facts presented upon the hearing. Courtenay D. Allington testified that he was vice president of Harris, Small & Co. at the time the liquidating dividend was declared and, at that time, he owned 147 shares of capital stock of the company, 100 shares having been purchased in 1925 at a cost of $100 per share, and 50 additional shares in 1926 at a cost of $416.81 per share; that these two holdings were originally represented by two certificates, one for 100 shares, the other for 50 shares; that in 1927 he sold 3 of his shares so owned and turned in to the company his 50-share certificate, which was canceled and a new certificate for 47 shares was issued to him; that when the liquidating dividend was declared, he understood that had he at that time had a certificate just equaling the 39 percent provided

for, it would only have been necessary for him to turn in such certificate for cancellation in order to comply with the resolutions declaring the dividend and that the same would have been canceled, leaving his other certificate intact, but, the 47-share certificate not being sufficient to make up the 39 percent required, he turned in both certificates so that the 39 percent might be taken by first exhausting the 47-share certificate, and the remainder would then be taken from the 100-share certificate and a new certificate issued him.

Respondent's counsel, in cross-examining this witness, propounded to him the following questions:

Q. You testified that you turned in your forty seven share certificate and then you were forced to turn in the one hundred share certificate for the reason that the fifty share certificate, or rather, the forty seven share certificate did not make up the liquidating dividend. Now, isn't it a fact that this company required you to turn in all your stock? You could not turn in thirty nine percent; you had to turn all of it in, is that correct?

A. No, I don't think so.

Q. But, under the resolution, as you understand it, didn't it require you to turn in all your stock to the corporation?

A. No, I had to turn in thirty nine percent of it.

In answer to another question propounded by counsel for the respondent, witness said:

A. If I had happened to have a certificate for exactly thirty nine per cent of my total holdings, I could have turned in that certificate and no other. That is my understanding.

The witness testified further upon cross-examination:

Q. Well, as a matter of fact, you did turn in all your shares, and did you know, yourself, what shares were cancelled?

A. *I do for my own, yes sir, because I was vice president of the company. I actually did it. I signed certificates. I turned in my forty seven shares first.* [Emphasis supplied.]

Q. What do you mean—just a minute there. What do you mean, you turned it in first?

A. Well, I had sold previously three shares, and, as I say, I was familiar with the first in and first out rule, and the three shares I sold from my fifty share certificate, being my high priced stock, to save on my taxes. Well, when this liquidating dividend came, I figured on turning in my forty seven share certificate first, taking all I could out of that, and taking the balance out of the one hundred shares, because at the time I did that I considered that I was going to be able to do just the same as I had in the sale of the stock, if I could identify my certificates, I could take my forty seven shares, the $416 stock.

Witness further explained he made his income tax return for that year in so far as this transaction was concerned, upon the advice of a certified public accountant and that on the return he showed that the stock disposed of for the liquidating dividend was to be taken in so far as possible out of the 47-share certificate, the last purchased.

It was established at the hearing that the new certificates were signed by the petitioner, Courtenay D. Allington.

I think the undisputed facts in this case show that petitioners have so identified the shares sold as to take the transaction out of the first in, first out rule. It is recognized that mere intention is not controlling, but that something else must have been done, that something else must have happened which served to identify the particular shares turned in as those which were to be applied to the liquidating dividend.

Petitioner had the right to decide which shares of stock he would turn in on the liquidating dividend.

What could he have done in addition to what he did do to identify the shares actually turned in for the purpose of meeting the liquidating dividend? He might have written a letter to himself as vice president of the company charged with the duty of reissuing this stock, directing himself as such vice president so to handle the transaction. This he did not do and this, it seems to me, was entirely unnecessary. He might have given verbal instructions to the company as to how he wanted the transaction handled, but, he being the company for the purpose of reissuing stock, it would seem quite strange to say that he would have to give himself specific instructions.

A question so similar to this that it seems identical in all of its elements has been passed on recently by the General Counsel's office in G. C. M. 11743, XII–27–6264 (Internal Revenue Bulletin, July 3, 1933). In this memorandum, question 3 requested an opinion as to which shares were sold when the taxpayer sold 100 shares of stock and turned in two certificates, one being for 98 shares and the other for 588 shares. The 98-share certificate was acquired after the 588 shares. In the opinion it was said:

Question No. 3 relates to the case where A sold 100 shares, turning in certificate No. P— and a certificate representing all the other shares owned, and inquiries which shares were sold. *It is known that the 98 shares represented by certificate No. P— represent lots 5 to 8, inclusive, and the other certificate must therefore represent the 588 shares contained in lots 1 to 4, inclusive.* It is arguable that, since A has turned in all his certificates, none of the shares sold can be identified as coming from any particular lot, and that consequently all the 100 shares should be presumed to have been sold from lot 1. This argument would be much stronger if certificate No. P—, as well as the other certificate, had represented 100 or more shares, or if each certificate had represented less than 100 shares. *But certificate No. P—, in fact contained less than 100 shares, while the other certificate contained more than 100 shares, and if A had desired to sell all the shares from the latter certificate he would not have needed to turn in certificate No. P—. Therefore, the most reasonable presumption is that A was selling all the shares represented by certificate No. P—, and making up the balance of 2 shares from the other certificate.* Accordingly this office is of the opinion that all of lots 5 to 8, inclusive had been sold

together with 2 shares from lot 1. (Compare *Cleveland Trust Co.* v. *Commissioner, supra; Howbert* v. *Penrose,* 38 Fed. (2d) 577; *M. J. Scanlon* v. *Commissioner,* 21 B. T. A. 1120.) [Emphasis supplied.]

The above opinion suggested two exceptions—(1) in case good evidence was introduced that A did not intend to sell any particular shares; or, (2) his only purpose in turning in both certificates was to have all of his remaining shares represented by one certificate. The case here cannot be brought within either of these exceptions if we are to regard the undisputed testimony upon the hearing. Allington testified he did not think the resolution required him to turn in all of the stock, but only 39 percent, and, if he had happened to have a certificate for exactly 39 percent of his holdings, he could have turned in that one only.

Similarly, there is no support for the suggestion that the certificates were both turned in for convenience. The undisputed testimony shows that the shares of all stockholders except the Allingtons were represented by single certificates.

It seems clear that, if Allington had intended to take the liquidating dividend out of the 100-share certificate, only one certificate would have been surrendered. His cross-examination developed that he was aware of the income tax consequences of the sale from one lot or the other. In order to save taxes, he had on a previous occasion sold part of his high priced stock, and he intended to do the same thing in relation to the liquidating dividend.

Entertaining these views, I respectfully dissent.

BLACK and SEAWELL agree with this dissent.